Present: Carrico, C.J., Compton, Stephenson, Lacy, Hassell, and
Keenan, JJ., and Poff, Senior Justice

PAUL JOSEF HUSSKE

                      OPINION BY JUSTICE LEROY R. HASSELL, SR.

v.   Record No. 951880          September 13, 1996

COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

The primary issue we consider in this appeal is whether an indigent defendant has made the particularized showing necessary to require the Commonwealth, under the Due Process and Equal Protection clauses of the Fourteenth Amendment of the federal Constitution, to supply at its expense a DNA expert to assist the defendant.

I.

Paul Josef Husske was convicted in a bench trial of breaking and entering with intent to commit rape and the offenses of forcible sodomy, rape, and robbery. He was sentenced as follows: 20 years' imprisonment, suspended after serving 10 years, for breaking and entering with the intent to commit rape; 20 years' imprisonment, suspended after serving 10 years, for forcible sodomy; 40 years' imprisonment, suspended after serving 20 years, for rape; and 10 years' imprisonment, suspended after serving five years, for robbery.

The defendant appealed to the Court of Appeals, and a panel of that Court reversed the judgment of the trial court. The panel held that the defendant had a constitutional right to the appointment of a DNA expert at the Commonwealth's expense to assist him, and that the trial court erred by admitting in

evidence certain statements that the defendant had made to mental health workers. Husske v. Commonwealth, 19 Va. App. 30, 448 S.E.2d 331 (1994). The Court of Appeals granted the Commonwealth's petition for a rehearing en banc, vacated the panel's judgment, and, by an equally divided Court, affirmed the judgment of the trial court. Husske v. Commonwealth, 21 Va. App. 91, 462 S.E.2d 120 (1995). We awarded the defendant an appeal.

## II.

The victim, a young woman, lived in an apartment complex in Henrico County. One night as she was asleep in bed, she was awakened by being struck in the face with a hard object. She observed that her assailant, who was wearing a stocking over his face, was a white male with brown hair. He wore fabric gloves and threatened to kill her unless she was quiet. She recognized the attacker's voice because, on several earlier occasions, he had placed telephone calls to her home and left sexually obscene comments recorded on her telephone answering machine.

The assailant forced the victim to commit an act of oral sodomy upon him. He then placed a knife against her throat, and he moved the blade of the knife over her breasts, stomach, and toward her genital area. He committed an act of oral sodomy upon her and then raped her.

The assailant directed the victim "to go to her bathroom and shower." She turned on the water, but she did not bathe. The assailant took a purse, containing about $500 in cash, from the victim's room.

After the attacker fled, the victim went to her neighbors'

apartment. Police officers were summoned, and the victim was taken to a hospital where a physical evidence recovery kit was prepared. Hospital personnel used swabs to take specimens from the victim's mouth, upper thigh, vulva, and vaginal vault. A nurse also extracted blood from the victim which, along with the specimens, were placed in sealed containers and given to a police investigator, who took them to a laboratory for testing.

About four months after the victim was assaulted, a Henrico County police officer saw the defendant standing near the rear of an apartment located about 200 feet from the victim's apartment. The officer arrested the defendant and charged him with two "peeping tom" offenses.

Two days after his arrest, the defendant voluntarily contacted the Henrico County Mental Health and Retardation Services offices. An intake referral form was completed, and a notation was made on that form that the defendant had been referred by an attorney. The form contained a place to mark whether the contact was court ordered. A block containing the word "no" was marked.

On October 17, 1990, Ann C. Creed, an employee of Henrico County Mental Health and Retardation Services, completed a "Brief Evaluation Form and Client Data Form" for the defendant. Creed noted on the form that the defendant was depressed and chronically suicidal, and that his condition was exacerbated by his arrest on the "peeping tom" charges. The defendant stated that even though this was his first arrest on such a charge, he had been engaging in this behavior for 20 years and had gone "one

step further." He told Creed that he felt shame about his behavior and that he was "not worried about court involvement but [was] concerned over family's reaction to learning of his behavior."

The defendant appeared in the Henrico County General District Court on October 31, 1990, and pled guilty to the "peeping tom" offenses. He was sentenced on each charge to 12 months in jail with 12 months suspended, conditioned upon being of good behavior and keeping the peace for five years, and monitoring by the Community Diversion Incentive Program. The defendant was also required to continue participation in the Henrico County Mental Health and Retardation Services treatment program as a condition of his suspended sentence. On November 9, 1990, the defendant met with Dr. Michael Elwood, an employee of Henrico County Mental Health and Retardation Services. Dr. Elwood and the defendant discussed the defendant's arrest on the "peeping tom" charges and the problems the arrest had caused with the defendant's marriage.

The defendant met with Dr. Elwood on December 28, 1990, for "a suicide screening." The defendant had attempted suicide a week earlier. Dr. Elwood made arrangements for the defendant to be admitted on a voluntary basis to a hospital. The defendant's wife, who was present at this meeting, told the defendant that he should tell Dr. Elwood "what else was troubling him." The defendant's wife left, and Dr. Elwood asked the defendant about his wife's comments. The defendant stated that he had attempted rapes in the past and that he had "completed a rape." Dr. Elwood

did not question the defendant about the crimes at that time.

The defendant remained in the hospital for a few weeks, and Dr. Elwood did not contact him. Dr. Elwood met with the defendant on January 17, 1991. During that session, the defendant told Dr. Elwood that the defendant had attempted three rapes in the midwest and that he had "completed a rape" in the Richmond area about six months earlier in the same complex where he had been arrested for "peeping." The defendant said that he had watched the victim for several days before he raped her, and he conveyed to Dr. Elwood the details of his "successful rape." The defendant mentioned that he had used a rubber mallet to stun his victim, that he had pulled her nightclothes over her head, and that he ordered her "to shower" after the attack. Dr. Elwood did not insist upon details from the defendant, but listened to his statements.

Dr. Elwood recommended that the defendant be considered for participation in a sexual offenders' group. Subsequently, Dennis K. Kilgore and Patricia L. Winterberger, employees of Henrico County Mental Health and Retardation Services, evaluated the defendant. Dr. Elwood was present and did not observe anyone threaten or coerce the defendant during the session. The defendant essentially made the same statements about the "completed rape" to Kilgore and Winterberger that he had made to Dr. Elwood. The defendant's incriminating statements were subsequently communicated to the police, and he was arrested and charged for these offenses.

III.

Several months before trial, the defendant filed a motion asserting his indigency and requesting that the trial court appoint an expert, at the Commonwealth's expense, to help him challenge the DNA evidence that the Commonwealth intended to use. The trial court denied the motion. Two months later, the defendant renewed his motion for the appointment of an expert. He attached an affidavit from an attorney, William T. Linka, who had read extensively on the subject of DNA and who held himself out as an attorney familiar with issues surrounding the forensic applications of DNA technology. Even though the trial court denied the defendant's motion, the court appointed Linka as co-counsel to assist the defendant.

On the morning of trial, the defendant again asserted that he was entitled to the appointment of an independent defense expert in the forensic applications of DNA science and technology. The trial court informed the defendant's counsel that it had appointed Linka to serve as co-counsel for the defendant because the defendant's primary counsel had represented to the court that Linka was "the most knowledgeable member of the local bar in the area of forensic DNA application." The trial court denied the defendant's request for the appointment of a DNA expert at the Commonwealth's expense.

Marion S. Vanti, an employee of the Commonwealth's Division of Forensic Science, and Dr. Bruce Spencer Weir, a Professor of Statistics and Genetics at North Carolina State University, testified at trial for the Commonwealth as expert witnesses on the subject of DNA analysis. Both witnesses testified that the

defendant's DNA profile matched the profile of the individual who had attacked the victim. Vanti testified that the DNA analysis did not exclude the defendant as a contributor of the genetic material that the assailant left on the victim's body and clothing. She further stated that the statistical probability of randomly selecting a person unrelated to the defendant in the Caucasian population with the same DNA profile was 1 in 700,000. Weir also testified that the likelihood of a randomly selected Caucasian bearing the same DNA profile as the defendant was 1 in 700,000.

The defendant, relying principally upon Ake v. Oklahoma, 470 U.S. 68 (1985), asserts that the Due Process and Equal Protection clauses of the Fourteenth Amendment required that the trial court appoint, at the Commonwealth's expense, an expert to help him challenge the Commonwealth's forensic DNA evidence. The Commonwealth asserts that the defendant has no constitutional right under the Due Process or Equal Protection clauses for the appointment, at the Commonwealth's expense, of a DNA expert.

In Ake, the Supreme Court considered whether an indigent defendant has a constitutional right to a psychiatric examination and psychiatric assistance necessary to prepare an effective defense based on his mental condition, when his sanity at the time he committed the criminal offense is seriously in question. The Court stated:

> "This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on the Fourteenth

Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake."

Id. at 76. The Supreme Court, holding that an indigent defendant is entitled to the appointment of a psychiatrist to assist him in his defense, explained its rationale:

"We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, see Ross v. Moffitt, 417 U.S. 600 (1974), it has often reaffirmed that fundamental fairness entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system,' id., at 612. To implement this principle, we have focused on identifying the 'basic tools of an adequate defense . . .' Britt v. North Carolina, 404 U.S. 226, 227 (1971), and we have required that such tools be provided to those defendants who cannot afford to pay for them."

Id. at 77. The Supreme Court concluded that the Due Process clause's guarantee of fundamental fairness is implicated

"when [an indigent] defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, [and that in such circumstances] the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense."

Id. at 83.

In Caldwell v. Mississippi, 472 U.S. 320 (1985), the Supreme Court noted that a trial court had properly denied an indigent

defendant's requests for the appointment of a criminal

investigator, a fingerprint expert, and a ballistics expert, and

also that the Supreme Court of Mississippi properly affirmed the

trial court's decision because the defendant's requests were

accompanied by no showing of reasonableness.  The Supreme Court

stated:

> "[T]he defendant's request for a ballistics expert
> included little more than 'the general statement that
> the requested expert "would be of great necessarius
> witness."' . . .  Given that petitioner offered little
> more than undeveloped assertions that the requested
> assistance would be beneficial, we find no deprivation
> of due process in the trial judge's decision. . . .  We
> therefore have no need to determine as a matter of
> federal constitutional law what if any showing would
> have entitled a defendant to assistance of the type
> here sought."

Id. at 323 n.1.

Our research reveals that most courts which have considered

the question whether an indigent defendant is entitled to the

appointment of a non-psychiatric expert have applied the

rationale articulated in Ake, and, those courts have held that

the Due Process and Equal Protection clauses require the

appointment of non-psychiatric experts to indigent defendants

depending upon whether the defendants made a particularized

showing of the need for the assistance of such experts.  See,

e.g., Little v. Armontrout, 835 F.2d 1240, 1243-44 (8th Cir.

1987), cert. denied, 487 U.S. 1210 (1988); Moore v. Kemp, 809

F.2d 702, 709-12 (11th Cir.), cert. denied, 481 U.S. 1054 (1987);

Thornton v. State, 339 S.E.2d 240, 241 (Ga. 1986); Harrison v.

State, 644 N.E.2d 1243, 1252-53 (Ind. 1995); Kennedy v. State,

578 N.E.2d 633, 639-40 (Ind. 1991), cert. denied, 503 U.S. 921

(1992); State v. Coker, 412 N.W.2d 589, 592-93 (Iowa 1987); Polk v. State, 612 So.2d 381, 393-94 (Miss. 1992); State v. Moseley, 449 S.E.2d 412, 424-25 (N.C. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1815 (1995); State v. Mills, 420 S.E.2d 114, 117-19 (N.C. 1992); Rogers v. State, 890 P.2d 959, 966-67 (Okla. Crim. App. 1995), cert. denied, ___ U.S. ___, 116 S.Ct. 312 (1995); State v. Edwards, 868 S.W.2d 682, 697-98 (Tenn. Crim. App. 1993); Rey v. State, 897 S.W.2d 333, 337-38 (Tex. Crim. App. 1995).

We are of opinion that Ake and Caldwell, when read together, require that the Commonwealth of Virginia, upon request, provide indigent defendants with "the basic tools of an adequate defense," Ake, 470 U.S. at 77, and, that in certain instances, these basic tools may include the appointment of non-psychiatric experts. This Due Process requirement, however, does not confer a right upon an indigent defendant to receive, at the Commonwealth's expense, all assistance that a non-indigent defendant may purchase. Rather, the Due Process clause merely requires that the defendant may not be denied "an adequate opportunity to present [his] claims fairly within the adversary system." Ross v. Moffitt, 417 U.S. 600, 612 (1974).

Moreover, an indigent defendant's constitutional right to the appointment of an expert, at the Commonwealth's expense, is not absolute. We hold that an indigent defendant who seeks the appointment of an expert witness, at the Commonwealth's expense, must demonstrate that the subject which necessitates the assistance of the expert is "likely to be a significant factor in his defense," Ake, 470 U.S. at 82-83, and that he will be

prejudiced by the lack of expert assistance. Id. at 83. An
indigent defendant may satisfy this burden by demonstrating that
the services of an expert would materially assist him in the
preparation of his defense and that the denial of such services
would result in a fundamentally unfair trial. See State v.
Mills, 420 S.E.2d at 117. The indigent defendant who seeks the
appointment of an expert must show a particularized need:

> "'Mere hope or suspicion that favorable evidence is
> available is not enough to require that such help be
> provided.' . . . 'This particularized showing demanded
> . . . is a flexible one and must be determined on a
> case-by-case basis.' . . . The determination . . .
> whether a defendant has made an adequate showing of
> particularized necessity lies within the discretion of
> the trial judge."

Id. Accord Caldwell, 472 U.S. at 323-34 n.1.

Contrary to the Commonwealth's arguments, we have not
specifically held that Ake is implicated only in those cases
where the defendant's sanity at the time he committed an offense
is seriously in question. In Pope v. Commonwealth, 234 Va. 114,
360 S.E.2d 352 (1987), cert. denied, 485 U.S. 1015 (1988), we
rejected an indigent defendant's contention that he had a
constitutional right to the appointment, at the Commonwealth's
expense, of a private investigator. There, we held that the
trial court properly denied the defendant's motion "to appoint an
investigator to 'comb the neighborhood' for potential witnesses."
Id. at 119, 360 S.E.2d at 356.

Although in Pope we rejected the defendant's argument that
he was entitled to relief in accord with Ake, we relied upon
Watkins v. Commonwealth, 229 Va. 469, 331 S.E.2d 422 (1985),

cert. denied, 475 U.S. 1099 (1986), in reaching our conclusion. In Watkins, we held that consistent with the decisions of the United States Supreme Court, the mere "fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required." Id. at 478, 331 S.E.2d at 430 (quoting Ross v. Moffitt, 417 U.S. 600, 616 (1974)). Thus, in Pope and Watkins, the indigent defendants failed to make the requisite particularized showing of the need for the requested expert assistance.

Here, we are of opinion that the trial court did not err by refusing to appoint a DNA expert witness to assist Husske with the preparation of his defense.[*] As we previously stated, an indigent defendant who seeks the appointment of an expert, at the Commonwealth's expense, must show a particularized need for such services and that he will be prejudiced by the lack of expert assistance. The defendant failed to meet these requirements. At best, the defendant asserted, inter alia, that: DNA evidence is "of a highly technical nature;" he thought it was difficult for a lawyer to challenge DNA evidence without expert assistance; and he had concerns about the use of DNA evidence because "the Division of Forensic Science [was] no longer [conducting]

---

[*]We do not consider the defendant's contention that his Sixth Amendment rights of confrontation and compulsory process were abridged. The defendant did not make these arguments in the trial court, and we will not consider them here. Rule 5:25. Additionally, in view of our holding, we need not consider defendant's assertion that the trial court abridged his Sixth Amendment right to effective assistance of counsel by refusing to appoint an expert to assist him with the preparation of his DNA defense.

paternity testing in [c]riminal cases."  The defendant's generalized statements in his motions simply fail to show a particularized need.

Additionally, the defendant failed to demonstrate that he would be prejudiced by the lack of expert assistance.  Indeed, he could not make such a showing because, as the evidence of record reveals, he confessed to the crimes, and he described the details of his offenses with great specificity.

We emphasize that the Due Process and Equal Protection clauses do not require the appointment, at the Commonwealth's expense, of an expert witness for every indigent defendant.  As the United States Court of Appeals for the 11th Circuit has stated:

> "Requiring trial courts, both state and federal, to provide for expert assistance--through direct appointment or a grant of funds--would place a substantial, if not onerous, burden on the administration of criminal justice.  For example, the trial court would have to (1) appoint a defense expert for every expert available to the government; (2) provide for expert assistance whether or not such assistance turned out to be needed; and (3) provide for any additional experts the appointed experts might need to explore theories that could aid the defense in cross-examining prosecution witnesses or in presenting the defense's case.  We question the wisdom of such due process requirements absent a substantial showing, such as the one made in Ake, of a significant benefit to the truth-seeking function of a trial."

Moore, 809 F.2d at 712 n. 8.

IV.

The defendant argues that the trial court erred by failing to suppress his "incriminating statements made to mental health workers during the course of court-ordered therapy," and that the

use of "evidence derived therefrom, violated due process and his Fifth and Fourteenth Amendment rights against compulsory self-incrimination."  As we previously mentioned, the defendant voluntarily enrolled in the Henrico County Mental Health and Retardation Services treatment program before he was convicted of the "peeping tom" offenses.  The general district court, which convicted him of these offenses, suspended imposition of the sentences conditioned upon his continued participation in this program.  The defendant says that his "admissions to his mental health worker were coerced by the necessity of his complying with the terms of his suspended sentences.  The alternative to incriminating himself was the imposition of a twenty-four (24) month jail sentence."  We disagree with the defendant.

The Fifth Amendment of the federal Constitution states, in relevant part, that no person "shall be compelled in any criminal case to be a witness against himself."  This prohibition "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."  Lefkowitz v. Turley, 414 U.S. 70, 77 (1973).

The Fifth Amendment, however, only prohibits the use of a witness' statements which are the product of compulsion:

> "The [Fifth] Amendment speaks of compulsion.  It does not preclude a witness from testifying voluntarily in matters which may incriminate him.  If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment."

Minnesota v. Murphy, 465 U.S. 420, 427 (1984) (quoting United States v. Monia, 317 U.S. 424, 427 (1943)).  The Supreme Court has stated that

> "in the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself. . . . Witnesses who failed to claim the privilege were once said to have 'waived' it, but we have recently abandoned this 'vague term,' . . . and 'made clear that an individual may lose the benefit of the privilege without making a knowing and intelligent waiver.'"

465 U.S. at 427–28.

In Murphy, the Supreme Court considered whether the Fifth and Fourteenth Amendments prohibit the introduction in evidence of incriminating statements that a parolee made during a meeting with his probation officer.  In 1974, Marshall Murphy was questioned by police concerning the rape and murder of a teenage girl.  In 1980, Murphy pleaded guilty to an unrelated criminal charge.  His punishment was fixed at 16 months' imprisonment, which was suspended, and three years' probation.  As conditions of probation, Murphy was required to participate in a treatment program for sexual offenders, to report to his probation officer as directed, and to be truthful with the probation officer "in all matters."  Murphy was informed that if he failed to comply with these conditions, his suspension could be revoked.  Id. at 422.

Murphy met with his probation officer regularly until July 1981, when the probation officer learned that Murphy had ceased participation in the sexual offenders' treatment program.  The

probation officer informed Murphy by letter that his failure to meet with her would result in an immediate request for a warrant. Subsequently, a counselor in the sexual offender treatment program informed Murphy's probation officer that, during the course of treatment, Murphy had admitted that he had committed a rape and murder in 1974. The probation officer met with her supervisor, and the probation officer decided that she would convey this information to the police. The probation officer sent a letter to Murphy and asked him to contact her to discuss a treatment plan for the rest of his probationary period. Even though the probation officer did not contact the police before she met with Murphy, she had decided before the meeting that she would report any incriminating statements he made to her to the police. Id. at 423.

Subsequently, Murphy met with the probation officer in her office. The probation officer told Murphy that she had learned that he had admitted to having committed a rape and murder in 1974 and that this information indicated to her that he needed additional treatment. Murphy admitted to the probation officer that he had committed the rape and murder. The probation officer informed Murphy that she intended to relay the information to the police, and she encouraged him to turn himself in, which he refused to do. Subsequently, Murphy was arrested and convicted of first-degree murder. Id. at 423-25.

Rejecting Murphy's contention that his confession was the product of compulsion and, thus, inadmissible, the Supreme Court stated:

"The threat of punishment for reliance on the privilege [against self-incrimination] distinguishes cases of this sort from the ordinary case in which a witness is merely required to appear and give testimony. A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

Even so we must inquire whether Murphy's probation conditions merely required him to appear and give testimony about matters relevant to his probationary status or whether they went further and required him to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent. Because we conclude that Minnesota did not attempt to take the extra, impermissible step, we hold that Murphy's Fifth Amendment privilege was not self-executing."

Id. at 435-36 (footnote omitted).

Applying the aforementioned principles here, we hold that Husske's statements were not the product of compulsion and, thus, his Fifth Amendment right against self-incrimination was not violated. First, we note that the defendant's obligation to participate in the mental health treatment program did not in itself convert his "otherwise voluntary statements into compelled ones." Id. at 427. We also observe that the defendant, just as in Murphy, was not in custody for purposes of receiving Miranda protection when he made his incriminating statements. Id. at 430.

Here, just as in Murphy, no one required Husske "to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent."  Id. at 436.  The record before us is devoid of any evidence that the employees of Henrico County Mental Health and Retardation Services coerced the defendant in any manner.  There is no evidence of record that anyone forced the defendant to talk or threatened him in any way.  To the contrary, the defendant, at the urging of his wife, volunteered to Dr. Elwood the statement that the defendant had "completed a rape."  After the defendant made his confessions, he executed a release authorizing Henrico County Mental Health and Retardation Services to transmit this information to the Community Diversion Incentive Program.

V.

For the foregoing reasons, we will affirm the judgment of the Court of Appeals.

Affirmed.

SENIOR JUSTICE POFF, concurring in part and dissenting in part.

The majority affirms the judgment of the Court of Appeals sitting en banc, Husske v. Commonwealth, 21 Va. App. 91, 462 S.E.2d 120 (1995).  Under the mandate of that judgment, the earlier judgment and mandate of a panel of that Court, Husske v. Commonwealth, 19 Va. App. 30, 448 S.E.2d 331 (1994), were "withdrawn" and "vacated", and the judgment of the trial court was "affirmed", 21 Va. App. at 92, 462 S.E.2d at 120.

On the Fifth Amendment self-incrimination issue, I concur with the decision of the majority to apply the rule in Minnesota

<u>v. Murphy</u>, 465 U.S. 420 (1984). I dissent from the majority's decision upholding the denial of Husske's request for expert assistance concerning the controversy over the reliability of forensic DNA evidence that prevailed at the time of this trial. I do not, however, advocate a <u>per</u> <u>se</u> rule applicable in every prosecution of an indigent defendant.[1]

In <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985), the Supreme Court, invoking the principles applied in <u>Griffin v. Illinois</u>, 351 U.S. 12 (1956) and in <u>Britt v. North Carolina</u>, 404 U.S. 226 (1971), held that the due process and equal protection clauses of the Fourteenth Amendment require a State to provide "the basic tools of an adequate defense . . . to those defendants who cannot afford to pay for them." 470 U.S. at 77. The panel of the Court of Appeals held that the rule in <u>Ake</u> is not limited to capital murder prosecutions or to cases involving an insanity defense. I agree. The majority of this Court does not disagree.

The <u>Ake</u> rule applies, however, only when the defendant makes a "threshold showing" that the assistance of an expert to confront the prosecution will be "a significant factor at trial". 470 U.S. at 83. In satisfying that requirement, the defendant's

---

[1] Compare the facts and circumstances underlying the conclusions reached in the precedents of this Court in <u>Stewart v. Commonwealth</u>, 245 Va. 222, 239, 427 S.E.2d 394, 405, <u>cert. denied</u>, 510 U.S. 848, 114 S. Ct. 143 (1993); <u>George v. Commonwealth</u>, 242 Va. 264, 271, 411 S.E.2d 12, 16 (1991), <u>cert. denied</u>, 503 U.S. 973 (1992); <u>O'Dell v. Commonwealth</u>, 234 Va. 672, 686, 364 S.E.2d 491, 499, <u>cert. denied</u>, 488 U.S. 871 (1988); <u>Townes v. Commonwealth</u>, 234 Va. 307, 332, 362 S.E.2d 650, 664 (1987), <u>cert. denied</u>, 485 U.S. 971 (1988); <u>Pope v. Commonwealth</u>, 234 Va. 114, 119, 360 S.E.2d 352, 356 (1987), <u>cert. denied</u>, 485 U.S. 1015 (1988). <u>See</u> <u>also</u> <u>Moore v. Kemp</u>, 809 F.2d 702, 712 n. 8 (11th Cir.), <u>cert. denied</u>, 481 U.S. 1054 (1987).

burden is twofold.  The accused must demonstrate that the expert is required to address a critical issue and that the expert's assistance will contribute to the formulation and perfection of a viable defense.  In response to such a showing, "the State must, at a minimum, assure the defendant access to [an expert] who will . . . assist in evaluation, preparation, and presentation of the defense."  Id.

The majority of this Court holds that the Commonwealth had no such duty here because, they conclude, Husske failed to "show a particularized need and that he [would] be prejudiced by the lack of expert assistance."  My reading of the record compels the opposite conclusion.

Husske made five "threshold" motions for expert assistance.  Their cumulative effect was sufficient to show the trial judge that expert knowledge was to become "a significant factor at trial."

In the first motion, counsel advised the court that "[t]he Commonwealth intends to introduce . . . the evidence of DNA analysis" which he characterized as "crucial to the Commonwealth's case."  In support of the second motion, he filed the affidavit of an adjunct counsel, a practicing attorney reputed to be the most knowledgeable member of the local bar in the area of forensic DNA application.  The affiant opined that "it is impossible for a lay person to successfully challenge the DNA testing and results without the aid of an expert."  He explained that he was "concerned about the problems in testing degraded, low molecular weight forensic samples" and by "over 100

possible problem areas in the use of restrictive enzymes that could lead to an erroneous inclusion."

In preparation for the third request for assistance, counsel filed a motion for discovery of the Commonwealth's DNA evidence which resulted in disclosure of "all the protocols, copies of the autorads, as well as a 47-page Certificate of Analysis." In support of the fourth and fifth motions for assistance, counsel pursued the arguments he had advanced earlier.

Renewing the motion at the conclusion of the Commonwealth's evidence, he proffered some 400 pages of court opinions and testimony "taken in various other cases" that dramatized the nature and dimensions of the DNA dispute prevalent at that time in the scientific community[2]. A sampling of the expert testimony adduced in those cases reveals that, in the two years preceding Husske's trial, many learned scientists had concluded that portions of the DNA testing procedure were "badly flawed," "unreliable" and "demonstrably wrong." And, at least one expert characterized the scientific debates as "significant and honestly-held disagreement" over the validity of testing techniques.

Clearly, the Commonwealth's forensic DNA evidence was a critical issue because it was "a significant factor" in the identification of Husske as the criminal agent. Hence, the prevailing scientific controversy created a "particularized need" to challenge the laboratory methodology employed in the DNA

---

[2]Although the items proffered were excluded from evidence, they were admitted as exhibits for the record.

analysis, the validity of the conclusions reached by the analysts, and the testimony of the Commonwealth's expert witnesses. Knowledgeable as they were in the law, Husske's attorneys were laymen in the science of forensic chemistry, and as an indigent accused, Husske was prejudiced by his inability to obtain the expert assistance necessary to satisfy that need.

Consequently, under the facts of this case, the denial of the defense motions for expert assistance was a denial of Husske's rights under the Fourteenth Amendment to due process and equal protection of the laws.