COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Fitzpatrick, Judges Benton and Annunziata
Argued at Alexandria, Virginia


WILLIAM DEXTER LANSBERRY

                                    MEMORANDUM OPINION* BY
v.    Record No. 2296-99-4     CHIEF JUDGE JOHANNA L. FITZPATRICK
                                      NOVEMBER 14, 2000
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF WARREN COUNTY
                     Dennis L. Hupp, Judge

          Joseph R. Winston (Elwood Earl Sanders, Jr.;
          Public Defender Commission, on brief), for
          appellant.

          H. Elizabeth Shaffer, Assistant Attorney
          General (Mark L. Earley, Attorney General, on
          brief), for appellee.


     William Dexter Lansberry (appellant) was convicted in a

jury trial of aggravated sexual battery, in violation of

Sections 18.2-67.3 and 18.2-67.10.6 of the Code of Virginia,

1950, as amended.  On appeal, appellant contends that the trial

court erred in:  (1) failing to appoint a DNA expert to aid

defense counsel; (2) permitting the prosecutor to ask leading

questions of the child witness; and (3) denying defense

counsel's motion for a new trial due to the late disclosure of

exculpatory evidence.  We disagree and affirm his conviction.

---

          * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

Under familiar principles of appellate review, we examine the evidence in the light most favorable to the Commonwealth, the prevailing party below, granting to that evidence all reasonable inferences fairly deducible therefrom.  See Juares v. Commonwealth, 26 Va. App. 154, 156, 493 S.E.2d 677, 678 (1997). So viewed, the evidence established that appellant lived as a guest in a home with Dana Dove Houston (Houston), Houston's current husband Jerry Houston, and her two minor children, DD and BD, from a previous marriage.  In November 1998, Houston and her husband were working numerous jobs while appellant took care of her children.

On November 23, 1998, while Houston was at work, DD, the nine-year-old victim, went into appellant's room and sat on his bed.  DD testified that while he was there, appellant "was touching my privates . . . with his hands and his mouth," and that DD touched appellant "the same way he did me."  Later that night, according to Houston's testimony, DD told her that "Mr. Lansberry was messing with him," and that the child was "nervous and upset and rocking back and forth in the chair stating that he didn't want to live in my house . . . because of Mr. Lansberry."  The next day DD told his therapist, Lisa Rader (Rader), what had occurred.  Rader and Houston then contacted Investigator Richard Kurzenknabe (Kurzenknabe) at the Front Royal Police Department.  Kurzenknabe learned from DD that "Mr.

-

Lansberry orally sodomized [the victim] and then requested that [the victim] reciprocate and orally sodomize him." Kurzenknabe searched appellant's residence for evidence of sexual abuse, collecting both DD's and appellant's clothing and bed sheets from the home, and collecting DNA samples from the home and from appellant's person.

Based upon the investigation, William Dexter Lansberry was indicted by a grand jury on two counts of oral sodomy, in violation of Code § 18.2-67, and one count of aggravated sexual battery, in violation of Code § 18.2-67.3 and § 18.2-67.10.6.

On February 12, 1999, the Commonwealth filed a pretrial "Notice of Intent to Offer DNA and Profile Evidence." Attached to the pretrial notice was a certificate of analysis prepared by DNA expert Karolyn Tontarski (Tontarski). At trial, the Commonwealth intended to offer evidence that samples taken from the "interior front fly area" of DD's underwear matched appellant's DNA structure. On February 16, 1999, appellant's counsel filed a "Motion for Funds for Forensic Expert." Counsel alleged that (1) he had no expertise in DNA profiling and needed expert assistance to properly prepare his defense; (2) the Commonwealth's report was ambiguous and confusing; and (3) the DNA material was mixed, contained no semen, and was not "subject to understanding by lay persons."

At a pretrial motions hearing on March 1, 1999, appellant's counsel argued that that he "just [did] not have the expertise"

-

to understand DNA evidence.  Counsel admitted that he had not attempted to communicate with Tontarski to review the certificate of analysis, assist his understanding of the analysis or ask any questions regarding the preparation of the report.

> COURT:  You are saying you are having difficulty understanding the report.  It seems like the first step towards understanding it is to talk to the expert and say, "Explain it to me."  Not necessarily help you challenge the report. That would be the second step, seems to me.
>
> Just because you have a report from someone at the State Lab does not necessarily mean that it would have to be challenged.  I mean, it doesn't mean that it is wrong.

Counsel argued that "I need expert advice on how to present this material.  That is all there is to it.  I have to have it."  The trial court denied appellant's request for the appointment of a DNA expert.

Then counsel moved to withdraw from the case, stating that "I am certainly not going to call down to the Commonwealth's Laboratory whose findings may be suspect in any case, which is one reason you need an [sic] DNA expert of your own, to look and make sure that they did it right.  Not that they do it wrong, except probably five or ten percent of the time."  "There are other lawyers who have had plenty of experience with this who can possibly do it."  Appellant's counsel indicated that he would attempt to talk to the Commonwealth's expert to understand

-

the report.  The trial court denied counsel's motion to withdraw but granted appellant a one-month continuance "to do what investigation and study [was needed] to bring [counsel] up to speed."

At trial, the Commonwealth's DNA expert testified that there could possibly be other people with the same DNA as appellant, but that it was 240,000 times more likely that the DNA on DD's underpants originated from appellant than from some other Caucasian male.  Tontarski could not state that the fluid in which the DNA was found was in fact saliva and she thought it "highly unlikely" that there was any body fluid other than saliva.

During its case-in-chief, the Commonwealth called DD, the victim, to testify.  DD stated that he was a little scared that morning, he spoke softly and had problems remembering even the name of the appellant, who had lived with DD for about five months.  The Commonwealth asked DD several questions which required a "yes or no" answer, such as "Now, did you touch Mr. Lansberry in any way?"  Appellant objected to these questions as leading.  However, the trial court overruled appellant's objections, concluding that these were "proper question[s]."  The Commonwealth's attorney also asked DD a couple of leading questions.  Appellant's counsel objected to the leading nature of the Commonwealth's questions.  The trial court overruled the objection and ordered the prosecutor to "refrain" from asking

-

leading questions in the future. Upon a subsequent objection to leading questions the trial court overruled the objection, finding that the leading questions were permissible with this child witness.

In his defense, appellant testified that he was never alone with DD in his room on the day of the offense, that he did not commit the acts alleged by the Commonwealth, and that DD was an aggressive child acting out against appellant for disciplining him on previous occasions.

In rebuttal, the Commonwealth called Lisa Rader (Rader), DD's therapist. The Commonwealth gave the defense a copy of her case notes including DD's statements regarding the incident with appellant. Appellant had not received these notes prior to Rader's testimony. Rader testified that based on her report of her conversation with DD, the incident involved only DD touching appellant and not appellant touching DD, as the other witnesses had testified.

Appellant made no objection or motion concerning Rader's testimony or the use of Rader's notes during the trial. Appellant was given time to read the notes prior to Rader's testimony and cross-examined Rader about the contents. Appellant also used Rader's notes, which showed some inconsistencies in DD's statements, to support his motion to strike the evidence and in his closing arguments to the jury.

At the conclusion of the trial, the jury acquitted appellant of the two sodomy charges and convicted him of aggravated sexual battery.  After trial, appellant moved to set aside the jury's verdict or, in the alternative, for a new trial.  For the first time, appellant argued that he was prejudiced by the Commonwealth's late disclosure of Rader's notes.  The trial court denied the motion for a new trial, finding that while the evidence was exculpatory, appellant was able to effectively use the evidence and was not prejudiced by late disclosure of the evidence.  Appellant also renewed his objections to the trial court's failure to appoint a DNA expert and to the use by the Commonwealth's attorney of leading questions.  The trial court overruled the objections on these issues and denied the motion to set aside the verdict and the motion for a new trial.

## II.  DNA EXPERT

On review, the denial of a motion to appoint an expert will not be reversed absent an abuse of discretion.  See Simerly v. Commonwealth, 29 Va. App. 710, 718, 514 S.E.2d 387, 391 (1999) (citing Elkins v. Commonwealth, 208 Va. 336, 337, 157 S.E.2d 243, 244 (1967)).  Although the right to expert assistance "is not absolute," due process requires that an indigent "who seeks the appointment of an expert witness, at the Commonwealth's expense, must demonstrate that the subject which necessitates the assistance of an expert is likely to be a significant factor

-

in his defense."  Husske v. Commonwealth, 252 Va. 203, 211-12,
476 S.E.2d 920, 925 (1996), cert. denied, 519 U.S. 1165 (1997)
(quoting Ake v. Oklahoma, 470 U.S. 68, 82-83 (1985)).

In Husske, the defendant was charged with breaking and
entering with intent to commit rape, forcible sodomy, rape, and
robbery.  At trial, the defendant requested the trial court to
appoint an expert to help him challenge the Commonwealth's DNA
evidence.  The trial court denied the defendant's request.  See
id. at 208, 476 S.E.2d at 923.  On appeal, the Virginia Supreme
Court affirmed and held that:

> [a]n indigent defendant who seeks the
> appointment of an expert, at the
> Commonwealth's expense, must show a
> particularized need for such services and
> that he will be prejudiced by the lack of
> expert assistance.  The defendant failed to
> meet these requirements.  At best, the
> defendant asserted, inter alia, that DNA
> evidence is 'of a highly technical nature;'
> he thought it was difficult for a lawyer to
> challenge DNA evidence without expert
> assistance; and he had concerns about the
> use of DNA evidence because 'the Division of
> Forensic Science [was] no longer
> [conducting] paternity testing in [c]riminal
> cases.'  The defendant's generalized
> statements in his motions simply fail to
> show a particularized need.

Id. at 213, 417 S.E.2d at 926 (emphasis added).

In the instant case, appellant's request tracks the
"generalized statements" of Husske.  He stated that he was
incapable of defending the case without expert assistance
because the DNA evidence was "confusing" and "ambiguous" in

-

nature, and he lacked "expertise" with DNA evidence.  Counsel

also alleged that the DNA evidence was "not subject to

understanding by laypersons."  Such "generalized statements

. . . simply fail to show a particularized need."  Id. at 213,

417 S.E.2d at 926.

### III.  LEADING QUESTIONS

While leading questions on direct examination are generally

improper, reversible error occurs only if the appellant can show

prejudice.  See Belton v. Commonwealth, 200 Va. 5, 7, 104 S.E.2d

1, 3 (1958).  A question is not rendered a leading question

merely because it is framed to require an answer of "yes" or

"no."  See Charles E. Friend, The Law of Evidence in Virginia

§3-5 (4th ed. 1993).  The trial court has "large discretion" in

the matter of leading questions.  See Flint v. Commonwealth, 114

Va. 820, 823, 76 S.E. 308, 310 (1912).

The trial court may properly permit leading questions where

the witness is reluctant to answer, slow to understand, or is

under some incapacity such as infancy.  See Hausenfluck v.

Commonwealth, 85 Va. 702, 708, 8 S.E. 683, 686 (1889); see also

Charles E. Friend, The Law of Evidence in Virginia §3-5 (4th ed.

1993).[1]  Here, DD is a young (nine-year-old) boy, and the nature

---

[1] According to The Law of Evidence in Virginia §3-5 (4th ed. 1993), leading questions

> . . . may also be asked where the witness
> proves reluctant to answer or slow to
> understand.  Leading questions should be

-

of the charges reasonably caused his hesitancy in testifying. For example, at the beginning of his testimony, the child testified that he did not remember appellant's name, although appellant had lived with DD for approximately five months. Indeed, DD stated on the morning of the trial that he was "a little scared" and spoke softly in responding to questions. Under these circumstances, we find no error in the use of some leading questions by the Commonwealth.[2]

Furthermore, appellant failed to demonstrate any prejudice resulting from the Commonwealth's use of leading questions. In response to proper questioning by the Commonwealth's attorney, the child witness testified in detail about the elements of the charged offenses, including where the offense occurred and the

permitted where the witness is under some incapacity, such as infancy or mental deficiency; or does not speak English well. Leading is also available as a means of refreshing memory, and is frequently used where the matter is not one in any real dispute.

It should be noted that allowance of leading questions is a matter largely within the discretion of the trial judge. Ordinarily, the allowance of such a question is not grounds for reversal. Even if the judge's ruling is erroneous, the error is harmless where other testimony confirms the answer to the leading question, or it is otherwise obvious that no harm has been done to the objecting party.

[2] Additionally, many of the "leading questions" appellant objected to were simply not leading questions. They merely required a "yes" or "no" response.

-

specific manner in which appellant "touched" him.  Absent any prejudice alleged by appellant, the trial court did not err.

## IV.  MOTION FOR A NEW TRIAL

Appellant next contends that the trial court erred in denying his motion for a new trial because the Commonwealth's attorney did not turn over statements made by the victim to Rader, the victim's therapist, until Rader was called to the stand.  We find that appellant is procedurally barred from raising this issue on appeal by Rule 5A:18.

When the Commonwealth's attorney called Rader to the stand, he handed Rader's notes to appellant.  Appellant had not been provided a copy of the notes prior to Rader being called to the witness stand.  The trial court provided appellant time to examine the notes prior to allowing Rader to begin testifying. However, appellant did not object to the testimony or use of the notes at any time during the trial.  Appellant did not request a continuance or mistrial based upon this evidence.  Appellant cross-examined Rader, using the notes.  At the end of the trial, appellant made a motion to strike the evidence based in part upon the inconsistencies in the victim's statements and Rader's notes.  When the motion was denied, appellant used Rader's notes in his argument to the jury that the victim's statements contained inconsistencies.  However, appellant never objected to the use of Rader's notes until after the jury reached a verdict.

-

The primary purpose of Rule 5A:18 is to inform the trial judge of possible error so that he or she can consider the issue intelligently and take any corrective actions necessary to avoid unnecessary appeals, reversals, mistrials and retrials.  See Campbell v. Commonwealth, 12 Va. App. 476, 479, 405 S.E.2d 1, 2 (1991) (en banc); Rule 5A:18.  When appellant was handed the previously-undisclosed notes he made a decision to proceed with the trial with the evidence instead of attempting to seek a mistrial or pursue other remedies.  The appellant failed to object and provide the trial judge an opportunity to rectify the problem when he decided to proceed to a verdict.  See Tickel v. Commonwealth, 11 Va. App. 558, 563, 400 S.E.2d 534, 537 (1991).  The fact that this argument was raised initially in a post-trial motion to set aside the verdict and for a new trial does not preserve the issue for appeal.[3]  See Bobblett v. Commonwealth, 10 Va. App. 640, 651, 396 S.E.2d 131, 137 (1990).  The trial judge lacks a chance to remedy the situation once the jury has reached a verdict.  Thus, appellant failed to meet the mandates of Rule 5A:18 by waiting until after the verdict to present the problem

---

[3] Although the trial court considered and denied appellant's objection to the "late disclosure" of Rader's notes in appellant's post-trial motions, it was not required to do so. The timing of the appellant's objection prevented the trial court from taking corrective action during the trial.

Furthermore, even if appellant had properly preserved this issue for appeal, we note that he has failed to offer any evidence of "prejudice" to his case derived from the "late disclosure" of Rader's notes.

-

to the trial judge.  Since no timely and proper objection to the "late disclosure" of Rader's notes was presented to the trial court, we do not address the merits of this argument on appeal. Rule 5A:18.

Accordingly, we hold that appellant did not make the requisite showing of a particularized need for a DNA expert, the trial court did not abuse its discretion in allowing the Commonwealth to ask the child victim some leading questions and appellant is barred from appealing the late disclosure of Rader's notes.

<u>Affirmed.</u>

Benton, J., concurring and dissenting.

I concur in Parts I, III, and IV of the opinion. I dissent, however, from Part II, which affirms the trial judge's refusal to appoint a DNA expert to assist William Lansberry in his defense.

Principles the United States Supreme Court reaffirmed in Ake v. Oklahoma, 470 U.S. 68 (1985), bear repeating:

> This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake.
>
>     \*     \*     \*     \*     \*     \*     \*
>
> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system." To implement this principle, we have focused on identifying the "basic tools of an adequate

-

> defense or appeal," and we have required
> that such tools be provided to those
> defendants who cannot afford to pay for
> them.

Id. at 76-77 (citations omitted).  Most courts that have considered the issue, now including Virginia, have held that these principles apply when an accused makes a particularized showing of need for the assistance of an expert when the prosecutor intends to rely upon DNA evidence.  See Husske v. Commonwealth, 252 Va. 203, 211-12, 476 S.E.2d 920, 925 (1996).

In Husske, the Court "h[e]ld that an indigent defendant who seeks the appointment of an expert witness . . . must demonstrate that the subject which necessitates the assistance of the expert is 'likely to be a significant factor in his defense' and that he will be prejudiced by the lack of expert assistance."  Id. (citation omitted).  Denying Husske's request, the Court ruled (1) that his counsel only made "generalized" statements about his need and (2) that he could make no showing of prejudice "because . . . he confessed to the crimes" in great detail.  Id. at 213, 476 S.E.2d at 926.

Lansberry's counsel, however, made a sufficiently particularized showing to justify his request.  In addition to asserting that he had "no expertise in DNA profiling," he stated that he needed "expert investigation to provide . . . sufficient information to properly defend . . . Lansberry," that the laboratory DNA analysis report "is ambiguous and confusing

-

concerning its findings," and "that the DNA material is minor and mixed and that there is no semen found at all; therefore, the evidence . . . is very minimal and not subject to understanding by lay persons."  Lansberry's counsel attached to his motion the report of DNA analysis that the Commonwealth tendered.  That report was conclusory, ambiguous in its description of the "genetic material" tested, and provided statistics based on "assuming only one foreign contributor to the mixture."

Refusing the request for an expert witness, the trial judge suggested to defense counsel that the Commonwealth's DNA expert could answer his questions about the report.  Counsel advised the judge that such a discussion would reveal to the Commonwealth's witness the nature of his defense and was "not going to lead me to understand how [he] may be able to view this toward[] innocence."  The United States Supreme Court "has often reaffirmed that fundamental fairness entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system.'"  Ake, 470 U.S. at 77 (citation omitted).  The notion that Lansberry would have a fair opportunity to present his defense based upon his counsel's informal pre-trial discussion with the scientific expert the Commonwealth proposed to use in its effort to convict Lansberry cannot be a serious proposition.  Such a procedure gives the Commonwealth "a strategic advantage over the defense . . .

-

[that] cast[s] a pall on the accuracy of the verdict obtained."
Id. at 79.

Expert witnesses are permitted to offer opinions about facts they or others have gathered and about their own examination of evidence. Those opinions are often judgments that are subject to reasonable dispute by other experts. When issues are complex, as with DNA and the interpretation of DNA results, expert witnesses aid parties in many ways, not the least of which is identifying "the probative questions to ask of the opposing party's [experts] and . . . interpret[ing] their answers." Id. at 80. Recognizing the complexities of the underlying methodology supporting DNA analysis and the complexities of the interpretation of results, the National Academy of Sciences through its Committee on DNA Technology in Forensic Science recommended the following:

> Defense counsel must have access to adequate expert assistance, even when the admissibility of the results of analytical techniques is not in question, because there is still a need to review the quality of the laboratory work and the interpretation of results. When the prosecutor proposes to use DNA typing evidence or when it has been used in the investigation of the case, an expert should be routinely available to the defendant. If necessary, he or she should be able to apply for funds early in the discovery stages to retain experts without a showing of relevance that might reveal trial strategy. Whenever possible, a portion of the DNA sample should be preserved for independent analysis by the defense.

-

Report of the Committee on DNA Technology in Forensic Science, National Research Counsel, DNA Technology in Forensic Science, p. 147 (April 1992).

I would hold that counsel's motion, memorandum, and statements at the hearing particularized his need for expert assistance to provide Lansberry an adequate defense at trial. Inherent in the particularized showing that he made is a showing that the absence of expert assistance would be prejudicial to Lansberry's defense.

The ambiguity of the DNA report is evidenced by the jury's acquittal of Lansberry on both charges of sodomy. However, the Commonwealth used that same evidence to support its charge that Lansberry was "guilty of fondling [the child's] genitals," the basis of the aggravated sexual battery conviction. Relying upon its expert's testimony that the deposit of the unspecified genetic material she found "is more consistent . . . with a primary transfer than with a secondary transfer," the prosecutor argued to the jury: "I defy anyone to come up with a reasonable, rational explanation why a 54 year old man's genetic material gets inside a nine year old boy's underpants accidentally."

The record in this case adequately demonstrates that an expert in this matter would have been of significant assistance to Lansberry in his defense and that Lansberry was prejudiced by

-

the lack of that assistance.  Thus, I would reverse the conviction and remand for a new trial.