COURT OF APPEALS OF VIRGINIA

Present:   Judges Clements, Haley and Beales
Argued at Richmond, Virginia


DEANNA HILDA LARGE

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1027-06-2            JUDGE JEAN HARRISON CLEMENTS
                                                           OCTOBER 30, 2007
COMMONWEALTH OF VIRGINIA AND
   COUNTY OF SPOTSYLVANIA


FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Ann Hunter Simpson, Judge

Eugene H. Frost (Mell & Frost, on brief), for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General
(Robert F. McDonnell, Attorney General, on brief), for appellees.


        Deanna Hilda Large (appellant) was convicted in a jury trial of involuntary manslaughter,

in violation of Code § 18.2-36.[1]  On appeal, she contends the trial court erred (1) in finding the

evidence sufficient, as a matter of law, to convict her of involuntary manslaughter and, (2) in

denying her motions for the appointment of defense experts in animal behavior and trace

evidence.  Finding no error, we affirm the trial court's judgment and appellant's conviction.

        As the parties are fully conversant with the record in this case, and because this

memorandum opinion carries no precedential value, this opinion recites only those facts and

incidents of the proceedings as are necessary to the parties' understanding of the disposition of this

appeal.

_____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

        [1] Appellant was also convicted of two misdemeanor counts of allowing a dog to run
at-large in violation of Spotsylvania County Ordinance § 4-21.  She does not challenge these
convictions on appeal.

I. BACKGROUND

"Under familiar principles of appellate review, we view the evidence and all reasonable inferences fairly deducible from that evidence in the light most favorable to the Commonwealth, the party that prevailed below." Banks v. Commonwealth, 41 Va. App. 539, 543, 586 S.E.2d 876, 877 (2003). So viewed, the evidence established that eighty-two-year-old Dorothy Sullivan had resided at 205 Oak Crest Drive of the Oak Crest Subdivision in Partlow, Virginia for twenty-two years. Mrs. Sullivan owned a shih tzu dog named Buttons that she walked with a retractable leash wrapped around her left hand.

On March 8, 2005, authorities found Dorothy Sullivan's body on the edge of her property, having been mauled to death by three pit bull terriers. In the woods next to her property, authorities found Buttons's body, still attached to its fully-extended leash. Appellant and Renie Costello, also residents of the Oak Crest Subdivision, owned the only pit bull dogs in the area.

In August of the year preceding the March 8, 2005 attack, a "brindle colored" and two other pit bulls entered the property of Donna Moore, another Oak Crest resident. The three dogs tore the floor out of her mobile home, attacking her cats and killing one of her kittens. Moore confirmed with appellant's daughter that the dogs belonged to appellant, and then informed her that appellant's dogs had just attacked Moore's cats. Moore also complained to Animal Control and in response, Animal Control Officer Bill Clarke investigated at appellant's home and discovered that three of appellant's pit bulls ran loose that morning. Appellant claimed that the puppy had returned home, but the two other dogs remained at-large. After the warden left, Moore sat at the end of her driveway, saw the dogs return to her yard, and then she followed them. She saw appellant's daughter walk down the road and call to the dogs. Eventually the dogs left with appellant's daughter.

Later that day, Clarke returned to appellant's house when he saw two female pit bulls located in appellant's driveway. Clarke captured the dogs, identified as Charity and Scarlet, and informed appellant that they matched the description of two that had chased and possibly killed one of Moore's cats. Clarke also told appellant that she had violated the county-wide leash law by allowing her dogs to run free. Appellant surrendered both dogs to the county and in exchange, Clarke agreed to forgo the ordinance violations.

In October 2004, Janet Stegner, who lived about eight hundred feet from appellant's house in the same subdivision, saw two brindles and one black and white pit bull tree her cat. The two brindles turned and came towards her growling, and the black and white dog retreated towards appellant's property. Janet Stegner and her daughter had called the dog warden on two occasions concerning the pit bull dogs treeing her cat.

Two weeks before the March 8, 2005 attack, James Stegner, Janet Stegner's husband, saw two brindle pit bulls and a black and white pit bull "tree[] all four" of his cats. Stegner knew the dogs belonged to appellant because he had been chasing them off of his property towards appellant's for over a year. A few times during the chases, he watched the dogs go "up into the cul-de-sac and then off the cul-de-sac up into [appellant's] driveway."

Jamie Blair, appellant's next-door neighbor, witnessed appellant's pit bulls running at-large on her property "five or six" times. Consequently, Blair called appellant's home, usually speaking with one of her children, and informed them that her dogs roamed loose on Blair's property. In response, appellant or appellant's children would retrieve the dogs. On one occasion about a week before the March 8 attack, two black and one brindle colored pit bulls approached Blair's open sliding glass door. The three dogs growled at Blair's children who stood at the window. Again, Blair phoned appellant's home to inform her. Blair called Animal Control only once regarding appellant's loose dogs.

On March 1, 2005, Mary Embrey, another resident of Oak Crest Subdivision, called Animal Control when she saw three pit bulls attack and kill her German shepherd. She described one of the pit bulls as "black with a little white diamond," the second as a "brindle," and the third as "black." Officer Clarke responded to Embrey's call and together they went to appellant's home. When Clarke asked appellant to exhibit every dog she owned, appellant brought out three black and white pit bulls, including a puppy. Embrey failed to identify the three exhibited dogs as those that attacked her German shepherd and claimed the dogs involved were "hiding somewhere else." When Clarke told appellant that three pit bulls had killed the German shepherd, appellant "shrug[ged] her shoulders" in response. When Embrey told appellant that the pit bulls involved were "very dangerous" and that Embrey would like to see the dogs caught "before they killed somebody else or somebody's child," appellant just looked at her and walked away.

Subsequently, Embrey, Embrey's husband, and Officer Clarke investigated Renie Costello's home, the only other pit bull owner in the neighborhood. There, they confirmed that Costello restrains her two pit bulls in her home and by an enclosed yard. After seeing Costello's pit bull tied up in her backyard, Embrey and her husband informed Officer Clarke that Costello's pit bull was not involved in the German shepherd attack.

On March 8, 2005, seven days after the German shepherd attack, Mrs. Sullivan's daughter, Doris Phelps, drove out to see her mother. Upon arrival, she encountered three "very aggressive" and "growling" dogs that came running towards her. Phelps entered Mrs. Sullivan's home and called to her mother and Buttons. After no response, Phelps stepped outside and saw the same three dogs over by the edge of the woods. Phelps screamed for her mother and Buttons, realizing that her mother was lying at the edge of the woods where the dogs hovered. She saw the dogs circling and standing over her mother's body. The dogs charged Phelps again,

whereupon she re-entered her mother's home, found a rolled up newspaper insert she could use to frighten the dogs, exited the home, and moved down the steps towards her mother. When the dogs approached Phelps for the third time, she used the newspaper to smack them on the nose until she could step back into the house and call 911.

Responding to a call from dispatch, Officer Clarke arrived at Mrs. Sullivan's home along with the fire and rescue squad. A few minutes later, Deputy Sheriff Mark Shull joined Clarke and both officers drew their weapons and stood on the edge of the woods to ensure the rescue squad could safely remove Mrs. Sullivan's body. Then the officers spotted two dogs coming through the woods but the dogs retreated toward an area of the subdivision called Cypress Court where appellant lived. Clarke got into his truck and drove to Cypress Court. He approached appellant's house and saw a black, white and brindle pit bull, later identified as Nikki, exit the woods and run up to appellant's porch. Appellant admitted to Clarke that she owned Nikki, whereupon Clarke seized the dog and later showed it to Phelps who positively identified Nikki as one involved in her mother's attack. Subsequently, Nikki was euthanized.

While Officer Clarke investigated at appellant's home, Officer Shull remained on Mrs. Sullivan's property. There, he saw a small black dog and a larger brindle dog emerge at the wood line, both animals matching Phelps's previous description to Shull. The two dogs charged Shull whereupon he fired four rounds, killing the small black one at the scene and hitting the larger brindle dog. Authorities later found the brindle dog dead in the woods. Animal Control officers canvassed the whole area that day and found no other pit bulls.

Mrs. Sullivan's autopsy report revealed that she died from "severe multiple penetrating trauma to her body which trauma was consistent with a dog attack." Consistent with ordinary practice during an autopsy, no hairs were removed from her head. Mrs. Sullivan's fractured left wrist was "consistent" with a fall that could have occurred by her being pulled down to the

ground suddenly by her dog's leash wrapped around her left wrist when the larger dogs attacked and suddenly dragged her dog away.

Two days after Mrs. Sullivan's death, Animal Control Officer Jason Cook responded to appellant's call that two more of her pit bulls, identified as Lilith and Treasure, ran at-large. Appellant explained that the dogs "must have gotten out when one of the children left the house." After searching appellant's property, the two dogs reappeared and appellant surrendered them to Officer Cook.

Joseph Cagnina, a detective with the Spotsylvania County Sheriff's Department, investigated the March 8, 2005 fatality at appellant's home. There, appellant told Cagnina that she owned Nikki, but did not claim the other two dogs involved. Appellant also disclosed that she did not restrain her dogs or use any kind of safety device, leashes, fences, or chains. She told Cagnina that she allowed her dogs to leave the residence for ten to fifteen minutes at a time to relieve themselves. Initially, appellant owned thirteen pit bulls, gave some away over time, but claimed ultimately to have kept only three. On March 8, 2005, she claimed to own three pit bulls.

On March 10, when Cagnina returned to appellant's home, he noticed one dog running at-large. That same day, appellant signed over what she claimed to be her last two pit bulls to Officer Cook. Appellant told Cagnina that she knew pit bulls had an aggressive nature. Appellant's kennel license had expired in 2004. Her front screen door did not lock, and the lower part of the door was broken. Additionally, her dogs entered and exited the home freely. Appellant had no gate attached to her fenced-in area on her property. When Detective Cagnina searched appellant's home, he found a dog's choke chain attached to a brass "guard security" lock, several other brass padlocks and keys, and additional dog chains and leashes. Upon comparison, Cagnina discovered that appellant's choke chain and brass "guard security" lock

matched the model, shape, and size of the lock and chain found on the brindle dog shot at the scene and later found dead in the woods next to Mrs. Sullivan's property.

At appellant's trial, the Commonwealth marked for identification photographs depicting three different pit bull dogs. Exhibit 3 depicts a male reddish brindle pit bull, identified by witnesses as Zamal, wearing a choke chain collar with a brass lock engraved with the words "guard security." Exhibit 4 illustrates another male black pit bull with some spots of white on its neck and chest. Exhibit 5 depicts a black male pit bull with some brindle, identified by witnesses as Nikki. The three pit bulls in the exhibit photographs were not licensed in Spotsylvania County.

Doris Phelps testified that Zamal was the dog that approached and stood "right in front" of her when she moved down the stairs with a rolled newspaper insert to fight off the dogs on March 8, 2005. Phelps also identified the dog in Exhibit 4 as the dog that approached her on the right side. She identified Nikki in Exhibit 5 as the pit bull that approached her on her left.

Officer Clarke identified Nikki as the same dog he captured at appellant's home immediately following Mrs. Sullivan's attack.

Renie Costello, the only other pit bull owner in the development, knew that appellant owned Zamal because Costello had been to appellant's home to show appellant her own pit bull named Dozer.

Janet Stegner identified Zamal as one of the dogs that had treed her cat. James Stegner also identified Zamal as the dog "on [his] car with the cat up the tree" with the other two dogs that chased his cats about two weeks before the March 8 fatality. James recognized Nikki as the dog that traveled with Zamal.

Jamie Blair testified that she recognized Zamal as a dog belonging to appellant. Blair also knew appellant owned two black pit bulls, but could not positively identify them as the dogs depicted in Exhibits 4 and 5.

Mary Embrey testified that Zamal was the "last one involved" that "finished [] off" the attack and death of her German shepherd. The pit bull depicted in Exhibit 4 and Nikki also took part in the attack.

Leroy George, an expert locksmith, testified that a key recovered from appellant's home would unlock the brass lock found there and also fit the lock tumbler of Zamal's collar.

Dr. Karl Magura, a Virginia Department of Agriculture employee, testified as an expert in the field of veterinary medicine. Appellant also adopted Dr. Magura as appellant's animal behavioralist. Dr. Magura stated that he performed necropsies on the three dogs depicted in Exhibits 3, 4, and 5 and on Mrs. Sullivan's shih tzu. Magura testified that the shih tzu bled to death as a result of several neck bites that had severed the jugular vein.

During Magura's examination of Nikki, he found hair, foreign body material, red carpet plastic, and no dog food in the dog's stomach contents. Nikki's distal colon contained hair longer than the dog's hair indicating that the hair passed through the dog's digestive tract.

Magura further testified that originally, people bred pit bull dogs to be aggressive towards other dogs and specifically bred them to fight each other in dog pits. If properly trained and supervised, however, pit bulls are "some of the nicest dogs" a dog owner could expect to have. On cross-examination, Magura stated that pit bulls are "no more aggressive than a German shepherd or a Doberman or anything of that nature." Magura also explained that normally, dogs recently involved in a mauling would not separate due to their pack mentality.

Despite appellant's objection, Cary Oien, a forensic examiner with the FBI Laboratory in Quantico, Virginia, testified as an expert in the field of forensic trace evidence. Oien stated that

neither hair nor fiber examinations are "means of absolute personal identification."  Hairs obtained from hairbrushes and combs are not considered a "known scientific sample" because the hairs are not "plucked from someone's head."

Oien further explained that he would find two hair samples to be "consistent" with each other and therefore, derived from the same source if he found no significant differences between them.  Oien testified that he analyzed hairs from Mrs. Sullivan's hairbrushes and combs finding none that looked remarkably different within that sample range.  As a result, he concluded that the hairbrush and comb samples would constitute a reasonable known sample of Mrs. Sullivan's hair.

Oien also performed a microscopic comparison of Mrs. Sullivan's hairbrush and comb hairs with the hairs found in Nikki's stomach and concluded that the hairs "exhibited the same microscopic characteristics" and that he could find "no significant differences" between the two sample groups.

The jury subsequently convicted appellant of involuntary manslaughter.  This appeal followed.

## II.  SUFFICIENCY OF THE EVIDENCE

Appellant contends the evidence was insufficient, as a matter of law, to support her conviction of involuntary manslaughter.  She maintains the evidence failed to prove that she owned two of the dogs involved in the March 8, 2005 attack.[2]  We disagree.

In reviewing the sufficiency of the evidence to support a conviction, "we determine whether the evidence, viewed in the light most favorable to the prevailing party, the Commonwealth, and the reasonable inferences fairly deducible from that evidence support each

---

[2] The trial court granted appellant's motion to strike one of the running at-large misdemeanors pertaining to the unnamed black dog depicted in photograph Exhibit 4.

and every element of the charged offense." Haskins v. Commonwealth, 31 Va. App. 145, 149-50, 521 S.E.2d 777, 779 (1999). "'In so doing, we must discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom.'" Cirios v. Commonwealth, 7 Va. App. 292, 295, 373 S.E.2d 164, 165 (1988) (quoting Norman v. Commonwealth, 2 Va. App. 518, 520, 346 S.E.2d 44, 45 (1986)). We will affirm the conviction "unless it is plainly wrong or without evidence to support it." Shackleford v. Commonwealth, 262 Va. 196, 209, 547 S.E.2d 899, 906 (2001).

Here, the evidence proved that appellant owned at least Nikki and Zamal, the pit bull terriers involved in the March 8, 2005 death of Mrs. Sullivan. Doris Phelps, who appeared at the scene and saw three dogs circling her mother's body, positively identified Nikki and Zamal as two of the three dogs involved in the attack. Nikki and Zamal approached Phelps three times at close range as she attempted to reach her mother. Immediately following the attack, Officer Clarke saw Nikki exit the woods and run up to appellant's porch. When confronted, appellant admitted she owned Nikki.

Renie Costello, the only other pit bull owner in the development, identified Zamal from the photographic evidence and testified that he belonged to appellant. Four other witnesses, Janet Stegner, James Stegner, Jamie Blair, and Mary Embrey, positively identified Zamal as appellant's dog. Finally, Detective Cagnina compared Zamal's choke chain collar and brass lock with another chain and brass lock he recovered from appellant's home and stated that the items were "the same model and the same shape and size lock." Each bore the same "guard security" brand name. Leroy George, an expert locksmith, testified that a key recovered from appellant's home would unlock the brass lock found there and also fit the lock tumbler of Zamal's collar.

We hold, therefore, that this evidence sufficiently proved that appellant owned Nikki and Zamal, two of the pit bull dogs involved in the March 8, 2005 attack.

Appellant also contends that the evidence failed to prove that she knew or should have known that her dogs were dangerous. We disagree with appellant.

The Supreme Court has defined criminal negligence as those actions, while lawful, that are performed in a manner "'so gross, wanton, and culpable as to show a reckless disregard of human life.'" Lawson v. Commonwealth, 35 Va. App. 610, 618, 547 S.E.2d 513, 516 (2001) (quoting Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992)). The Court further described "gross negligence" as follows:

> The term "gross, wanton, and culpable" describes conduct. The word "gross" means "aggravated or increased negligence" while the word "culpable" means "deserving of blame or censure." "'Gross negligence' is culpable or criminal when accompanied by acts of commission or omission of a wanton or willful nature, showing a reckless or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable result of his acts."

Id. at 618, 547 S.E.2d at 516-17 (quoting Cable, 243 Va. at 240, 415 S.E.2d at 220 (citations omitted)). Whether an action constitutes gross negligence is ordinarily a matter of fact for a jury to decide. Frazier v. City of Norfolk, 234 Va. 388, 393, 362 S.E.2d 688, 691 (1987). Furthermore, in determining gross negligence, the fact finder "consider[s] the cumulative effect of a series of connected, or independent negligent acts, out of which arise the injuries, as showing the attitude of the offender." Bell v. Commonwealth, 170 Va. 597, 609, 195 S.E. 675, 680 (1938).

Applying these principles to the facts of this case, we find the evidence sufficient to prove appellant knew or should have known that her dogs were dangerous. Beginning in August 2004, Officer Clarke made appellant aware of the pit bull attack on Donna Moore's cats and told

appellant that she violated the county-wide leash law by allowing her dogs to run free. As a result, he seized two of appellant's pit bull dogs that took part in the cat incident and that matched Moore's description.

Janet Stegner was accosted by two of appellant's dogs that growled at her before retreating to appellant's property. Janet and her daughter had complained to Animal Control on two occasions concerning appellant's dogs.

Jamie Blair, appellant's next-door neighbor, notified appellant and her children repeatedly that her dogs roamed loose on Blair's property. In response, appellant or appellant's children would retrieve the dogs. About a week before the March 8 fatality, when three pit bulls approached Blair's open sliding glass door and growled at her children, Blair again phoned appellant's home to tell her to retrieve the dogs. Blair also called Animal Control once regarding appellant's loose dogs.

On March 1, 2005, Officer Clarke approached appellant regarding the pit bull attack on Mary Embrey's German shepherd. Clarke told appellant that three pit bulls had killed the German shepherd, and in response, appellant "shrug[ged] her shoulders." When Embrey told appellant that the pit bulls involved were dangerous and that Embrey "would like to see the[] dogs caught before they killed somebody else or somebody's child," appellant just looked at her and walked away.

Just two days following Mrs. Sullivan's death and appellant's surrender of Nikki to Animal Control, Officer Cook seized appellant's two remaining pit bull dogs that ran at-large in the neighborhood. Appellant told Detective Cagnina that the dogs "must have gotten out when one of the children left the house." Appellant also admitted to Cagnina that she knew pit bulls were aggressive. She told Cagnina that she did not restrain her dogs or use any kind of safety device and that she allowed her dogs to run free outdoors "for ten to fifteen minutes to relieve

themselves." Furthermore, despite appellant's apparent capability to restrain the dogs with chains, locks, and a fenced-in backyard, she allowed the dogs to roam in and out of the house freely with a broken and unlocked screen door, disregarding the risk posed by the animals.

We hold that, from this evidence, the jury could properly conclude that appellant knew or should have known her dogs were dangerous. Moreover, acting as fact finder, the jury could find that the cumulative effect of appellant's acts, including lack of adequate training and supervision of her dogs culminating in their repeated history of actual harm and threatening behavior to animals and humans, followed by her indifferent attitude to their actions caused Mrs. Sullivan's death, and therefore, constituted conduct "so gross, wanton, and culpable as to show a reckless disregard of human life." Thus, we conclude, that the evidence was sufficient, as a matter of law, to support appellant's conviction for involuntary manslaughter.

### III. EXPERT WITNESSES

Appellant further contends that the trial court abused its discretion in denying her motions for the appointment of defense experts in animal behavior and trace evidence. We disagree.

Upon request, the Commonwealth is required to "provide indigent defendants with the 'basic tools of an adequate defense,' and . . . in certain circumstances, these basic tools may include the appointment of non-psychiatric experts." Husske v. Commonwealth, 252 Va. 203, 211, 476 S.E.2d 920, 925 (1996) (quoting Ake v. Oklahoma, 470 U.S. 68, 77 (1985)). "[A]n indigent defendant seeking the appointment of an expert has the burden of showing a particularized need therefor." Barnabei v. Commonwealth, 252 Va. 161, 171, 477 S.E.2d 270, 276 (1996).

In Commonwealth v. Sanchez, 268 Va. 161, 597 S.E.2d 197 (2004), the Supreme Court set forth the "particularized need" test as follows:

> It is the defendant's burden to demonstrate this "particularized need" by establishing that an expert's services would materially assist him in preparing his defense and that the lack of such assistance would result in a fundamentally unfair trial. We made clear in Husske and subsequent cases that "mere hope or suspicion that favorable evidence is available is not enough to require that such help be provided." Whether a defendant has made the required showing of particularized need is a determination that lies within the sound discretion of the trial court.

Id. at 165, 597 S.E.2d at 199 (citations omitted). In this context, "[t]herefore, we will not disturb the decision of the trial court unless it is plainly wrong or without evidence to support it." Downing v. Commonwealth, 26 Va. App. 717, 723, 496 S.E.2d 164, 167 (1998).

Appellant maintains that had she been afforded an animal behavior expert, she could have rebutted the Commonwealth's contention that pit bulls are inherently dangerous. However, during the pre-trial hearing on appellant's motion, the Commonwealth noted that while pit bulls are inherently dangerous to other animals, the Commonwealth offered to stipulate that "as a breed pit bulls are not inherently dangerous to human beings." Furthermore, at trial, Dr. Magura testified not only as an expert in the field of veterinary medicine for the Commonwealth but also as an "animal behavioralist" for appellant. In fact, Dr. Magura's testimony actually aided appellant when he stated that in his professional opinion, pit bulls are "no more aggressive than a German shepherd or a Doberman or anything of that nature" and that if properly trained and supervised, pit bulls are "some of the nicest dogs" a dog owner could expect to have. Accordingly, appellant failed to show a particularized need for an animal behavior expert because the Commonwealth never argued pit bulls are inherently dangerous to human beings. Moreover, Dr. Magura provided the essential evidence appellant would have elicited from her own animal behavior expert, that is, that pit bulls are no more aggressive than other watchdog breeds and can be nice dogs if properly trained. Therefore, the trial court properly exercised its discretion in denying appellant's motion for an animal behavior expert.

Appellant also claims the trial court erred in denying her motion for a trace evidence expert. Appellant contends that had she presented her own trace evidence expert, she could have rebutted Dr. Oien's testimony because the hairbrush and comb sample was not a known suitable sample within generally accepted scientific standards. Appellant's claim has no merit. Again, she fails to state a particularized need for a trace evidence expert by making only a general claim for her own expert simply to rebut Dr. Oien's testimony. At trial, Dr. Oien stated that "neither hair examinations [n]or fiber examinations are means of absolute personal identification." Furthermore, appellant effectively cross-examined Dr. Oien, making clear that the hairbrush sample is not a "known scientific sample." Therefore, although appellant did not receive the particular expert she requested, appellant, in fact, received the services she requested by cross-examining Dr. Oien. Indeed, "while the Commonwealth is required to provide adequate expert assistance to indigent defendants in certain circumstances, it is not required to provide them with 'all assistance that a non-indigent defendant may purchase.'" Juniper v. Commonwealth, 271 Va. 362, 392, 626 S.E.2d 383, 403 (2006) (citing Husske, 252 Va. at 211, 476 S.E.2d at 925). Thus, we find the trial court did not abuse its discretion in denying appellant's motion for a trace evidence expert.

## IV. CONCLUSION

For these reasons, we affirm the judgment of the trial court and appellant's conviction.

Affirmed.