COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Fulton, Friedman and Raphael
Argued at Lexington, Virginia


CHRISTOPHER DWAYNE LUMPKIN

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0129-22-3                      JUDGE JUNIUS P. FULTON, III
                                                    JULY 18, 2023

COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
                            James J. Reynolds, Judge

          James C. Martin (Martin & Martin Law Firm, on briefs), for
          appellant.

          Ken J. Baldassari, Assistant Attorney General (Jason S. Miyares,
          Attorney General, on brief), for appellee.


        Christopher Dwayne Lumpkin appeals his convictions, following a jury trial, of two counts

of forcible sodomy of a child under thirteen, two counts of object sexual penetration of a child under

thirteen, and two counts of aggravated sexual battery of a child under thirteen, in violation of Code

§§ 18.2-67.1, -67.2, and -67.3.  Lumpkin asserts that the trial court abused its discretion when it

denied his repeated motions to appoint an expert and contends that the evidence was insufficient to

support his convictions.  He also asserts that the trial court imposed a disproportionate sentence.

Finally, he asserts that his Sixth Amendment right to confrontation was violated when he appeared

via video for his sentencing.  For the following reasons, we disagree, and affirm the convictions.

                                    BACKGROUND

        On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth."

*Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v.*

_____

        * This opinion is not designated for publication.  *See* Code § 17.1-413(A).

*Hudson*, 265 Va. 505, 514 (2003)). That principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

In June 2019, H.A. and her mother, Christie Lee, lived with Lumpkin, Lee's fiancé. On June 24, 2019, H.A. and Lumpkin drove Lee to work and then went to a pond to fish. After several hours, H.A. and Lumpkin returned home. Both H.A., then eleven years old, and Lumpkin showered and then watched a movie in Lumpkin's bed. During that time, Lee called Lumpkin's phone, but he did not answer.

While watching the movie Lumpkin "started rubbing on [H.A.'s] butt" and "told [her] to take [her] clothes off." H.A. complied because she was scared Lumpkin would hurt her. Lumpkin removed his clothes and inserted his fingers into H.A.'s vagina, moving them up and down. Lumpkin told H.A. "[t]o suck his dick," and H.A. put his penis in her mouth. H.A. stated that the sexual activity ceased because Lumpkin had to pick up her mother. H.A. put on the same clean pair of underwear she had on before Lumpkin told her to undress.

Upon returning home, Lumpkin and Lee argued. After Lumpkin walked outside to check on his garden, H.A. approached Lee and stated that Lumpkin "was forcing [her] to have sex with him." H.A. and her mother immediately fled to a neighbor's home where they called 911.

Danville Police Corporal Wood and Sergeant Shively investigated H.A.'s report of sexual assault. Corporal Wood took Lumpkin to the police station for questioning and then returned with a house key to allow H.A. and her mother to collect some belongings. Corporal Wood stated he did not remember H.A. changing clothes.

Danville Detectives Bailey and High arrived at Lumpkin's home while H.A. and Lee gathered their belongings. Detective Bailey drove H.A. and Lee to an emergency room in Lynchburg. Meanwhile, Detective High interviewed Lumpkin about the allegations. Lumpkin agreed to provide a buccal swab, swabs of his hands, and scrapings of his fingernails for testing.

H.A. arrived at the emergency room at 1:00 a.m. Sexual Assault Nurse Examiner (SANE) Donna Cling interviewed H.A. before collecting physical evidence. When Cling asked H.A. if anyone had hurt her, H.A. stated "it was Chris." Cling asked what Lumpkin had done, and H.A. stated that "he forced me to have sex with him." According to H.A., Lumpkin put his mouth on her genital region, her mouth, and her breasts. He had pushed her head down and made her perform fellatio and had rubbed his penis on her genitals. When asked if she had ever seen anything come out of Lumpkin's penis, she responded "white fizzy stuff." H.A. explained that she knew the "white fizzy stuff" was sperm because Lumpkin had told her it was.

H.A. told Cling that the sexual abuse had started around the beginning of the year and occurred one to three times a month. H.A. noted that she experienced pain while urinating after these encounters. H.A. indicated that she had not urinated, defecated, bathed, or douched since the June 24 incident.

Cling collected H.A.'s clothing and swabs and placed the evidence into the physical exam recovery kit (PERK) for testing. Forensic scientist Kathleen Holtsnoggle conducted DNA analyses of the samples in the PERK and those taken from Lumpkin. The DNA mixture profile from the lip area sample was attributed to H.A. and one additional contributor, which had no value. A DNA mixture profile from the anorectal sample was attributed to H.A. and one additional contributor, which also had no value. No male DNA was detected in the breast, perianal, or buttocks samples. Further, a DNA analysis of swabs taken from Lumpkin's mouth and hands indicated that there was

another contributor, but that DNA type was not suitable for comparison. H.A.'s PERK was sent for further testing at the central lab.

Forensic scientist Brian Covington also conducted a Y-chromosome DNA analysis (YSTR) for this case. Covington explained that YSTR analysis "targets different areas of the DNA, specifically the Y-chromosome DNA, which is specific to males." Covington was able to develop a Y-chromosome DNA profile from H.A.'s anorectal sample. Lumpkin could not be eliminated as a major contributor to the male DNA mixture profile.

Forensic scientist Catherine Columbo tested the yellow stain in the groin area of H.A.'s underwear. Seminal fluid and spermatozoa cells were identified in the yellow stain on H.A.'s underwear. Finally, a DNA mixture profile from the lip area sample was attributed to H.A., and Lumpkin could not be eliminated as a contributor.

On July 23, 2019, Piedmont Access to Health Services (PATHS) counselor Jessica Hayes conducted an initial assessment with H.A., Lee, and Lumpkin. Lumpkin explained what the allegations were to Hayes. Lumpkin's presence at the assessment concerned Hayes. At a follow-up interview on August 8, 2019, Lumpkin did not appear, and Hayes talked with H.A. individually.

H.A. told Hayes that Lumpkin "made me suck his thing" and that "stuff came out twice." When asked if she felt safe living in the same home as Lumpkin, H.A. stated she "[felt] safe. I never am with him alone anymore." H.A. indicated that Lumpkin told her he would buy her a new phone if she lied about the abuse. During successive interviews with H.A. on August 15 and 28, Hayes noticed H.A. was pulling out her hair. Hayes stated that the compulsion to pull hair is a sign of childhood trauma.

On August 16, 2019, Carlos Cottie and April Duckworth of Child Protective Services interviewed H.A. H.A. stated that after returning from the pond she showered and began watching a movie with Lumpkin in his bed. He told her to undress, undressed himself, and then inserted his

finger inside her genitals. She stated that this type of sexual contact had begun in January and sometimes occurred at Lumpkin's mother's home. H.A. stated that Lumpkin's penis did not go near her genitalia but that he had masturbated and ejaculated in front of her. H.A. indicated that Lumpkin had never kissed her on the face but that he sometimes licked her genitals and had done so on about five occasions before June 24.

In an August 20, 2019 recorded interview conducted by Danville Police Corporal Jacob Amos, H.A. recounted the June 24 events. She reiterated that after she and Lumpkin took Lee to her work, they went to a pond. After a few hours, they left the pond, returned home, and each took a shower. While H.A. was showering, Lumpkin looked for a movie to watch. They began to watch the movie on his bed. Then Lumpkin began to rub H.A.'s "butt." He told her to take off all her clothes and to "get to where he was at." He then "made [her] suck his thing" which H.A. stated was soft. Lumpkin also inserted his fingers in her "girl part." The sexual activity ceased because Lumpkin had to pick up Lee.

On direct examination, H.A. testified that Lumpkin's sexual advances had begun in early 2019. The first time Lumpkin initiated sexual activity with her was at his mother's home. Lumpkin told H.A. to undress, which she did. Lumpkin also disrobed and inserted his finger into H.A.'s vagina. He then made H.A. perform fellatio on him.

Over the next six months Lumpkin engaged in sexual activity with H.A. one to three times a month. He showered with her and masturbated in front of her. Once while preforming fellatio on Lumpkin, he ejaculated, and Lumpkin explained to H.A. that sperm was the "white stuff that comes out" of his penis. On cross-examination H.A. admitted that her reports of the incident differed slightly each time she reiterated them because she tried to put the sexual abuse out of her mind.

The Commonwealth moved to introduce, and the trial court admitted, a redacted transcript of the April 20, 2021 hearing during which Lumpkin testified about his erectile dysfunction.

Lumpkin testified in his defense and admitted that he was a convicted felon. He stated that in 2019, he and Lee were engaged and lived together in his home with H.A. He acknowledged fishing with H.A. on June 24, 2019, and explained that after they returned home, he showered. As H.A. prepared to shower, he asked to use the bathroom, and moved her clothing off the toilet. He suggested his DNA could have attached to her clothing from this touching. Lumpkin indicated that Lee and H.A. moved out of the house on June 24 but returned in August 2019. Lumpkin stated he demanded they leave in September 2019 because he and Lee continued to argue and "[j]ust couldn't get along." Lumpkin denied any sexually inappropriate behavior with H.A.

At sentencing, Lumpkin appeared by video "because of COVID issues." Lumpkin objected to appearing remotely, and the trial court overruled the objection. Lumpkin's counsel noted Lumpkin's exception to the court's ruling stating "that's a violation of the confrontation clause" and Lumpkin's due process rights.

The trial court sentenced Lumpkin to life imprisonment with all but twenty-five years suspended for each count of forcible sodomy with a child under the age of thirteen and object sexual penetration with a child under the age of thirteen. For each count of aggravated sexual battery with a child under the age of thirteen, the court sentenced Lumpkin to twenty years, with ten years suspended. Lumpkin's active incarceration totaled 120 years. In departing from the guidelines,[1] the trial court explained "this defendant sexually abused a young child who lived in his home with her mother and is not deserving of any consideration. He continued to write the victim and her family despite repeated court admonitions to stop. He does not ever need to be released." Lumpkin appeals.

---

[1] Lumpkin's sentencing guidelines ranged from thirteen years, eight months at the low point to twenty-nine years, four months at the high point, with a midpoint of twenty-four years, five months.

ANALYSIS

I. Appointment of an Expert and Medical Testing

Lumpkin asserts that the trial court erred when it denied his motions for the appointment of a urologist and for urine testing for semen content before trial. He argues that whether there is semen present in his urine was highly relevant to whether he left semen on the victim. Furthermore, he argues, he made a particularized showing when he "graphic[ly] descri[bed] the status of [his] sex organ in the motions hearing."

Whether an indigent defendant has made the required showing of a particularized need for expert assistance "is a determination that lies within the sound discretion of the trial court." *Johnson v. Commonwealth*, 292 Va. 772, 778 (2016) (quoting *Commonwealth v. Sanchez*, 268 Va. 161, 165 (2004)). The Commonwealth is required, "upon request, [to] provide indigent defendants with 'the basic tools of an adequate defense.'" *Husske v. Commonwealth*, 252 Va. 203, 211 (1996) (citing *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)). "[I]n certain instances, these basic tools may include the appointment of non-psychiatric experts." *Id.* Nevertheless, an indigent defendant's right to the appointment of an expert "is not absolute." *Johnson*, 292 Va. at 778 (quoting *Husske*, 252 Va. at 211).

Instead, an indigent defendant "must demonstrate that the subject which necessitates the assistance of [an] expert is 'likely to be a significant factor in his defense,' and that he will be prejudiced by the lack of expert assistance." *Id.* (quoting *Ake*, 470 U.S. at 82-83). That is, he "must show a particularized need." *Id.* "A particularized need is more than a '[m]ere hope' that favorable evidence can be obtained through the services of an expert." *Green v. Commonwealth*, 266 Va. 81, 92 (2003) (quoting *Husske*, 252 Va. at 212). Rather, it amounts to a "demonstrat[ion] that the services of an expert would materially assist [the defendant] in the preparation of his defense and that the denial of such services would result in a fundamentally

unfair trial." *Johnson*, 292 Va. at 778. "[W]hether a defendant has made the required showing of particularized need is a determination that lies within the sound discretion of the trial court." *Id.* (quoting *Sanchez*, 268 Va. at 165).

At the April 20, 2021 hearing, Lumpkin testified that since 2004 he has been unable to have an erection or ejaculate. He saw a physician for this issue in 2004 and 2005, but initial treatment was unsuccessful. Lumpkin was unable to remember where he received treatment or the name of the physician who provided treatment. Additionally, he has no medical records from that period. Not only has Lumpkin not received any treatment for his alleged impotence issues since 2004 or 2005, he has not even discussed the issues with any of his health care providers since that time. The trial court noted that "medical conditions are dynamic" and Lumpkin's diagnosis at the time of the motion in 2021 and in 2004 or 2005 may not have been the case at the time that the instant crimes occurred. The trial court denied Lumpkin's motion.

On September 7, 2021, Lumpkin renewed his motion to appoint a urologist. The Commonwealth argued that Lumpkin had not shown this test would materially assist him at trial. The trial court determined that the request was "a fishing expedition" because Lumpkin did not know what the test would show or where the results would lead but only hoped it would be helpful. The court denied the renewed motion for a urologist.

Lumpkin also moved for testing of a urine sample for semen content. Lumpkin's counsel proffered that a test could show semen seeping into his urine which can be indicative of a male who has not ejaculated in some time. The trial court found that this was also a "fishing expedition" and denied the motion.

The trial court did not abuse its discretion in concluding that Lumpkin failed to present a particularized need for an expert. Lumpkin had no documentation of his impotency, a problem he claimed existed since 2004. Nor did he assert that the condition, once diagnosed, would have

persisted to the date of the offenses and beyond. Additionally, he was unable to otherwise identify the diagnosing physician and had failed to mention the condition to any subsequent physicians for eighteen years. We also note that the crimes for which he was convicted occurred roughly two years before the request to appoint a urologist was made. Any finding that Lumpkin was impotent at the time of testing would therefore not necessarily prove that he was impotent at the time the crimes occurred. Although Lumpkin hoped that expert assistance would develop mitigating evidence that would lead to acquittal, "a mere hope or suspicion that favorable evidence may result from an expert's services does not create a constitutional mandate." *Hoverter v. Commonwealth*, 23 Va. App. 454, 467 (1996). Accordingly, we will not reverse the trial court's decision.

## II. Sufficiency of the Evidence

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Lumpkin asserts that the evidence was insufficient to support any of his convictions. He argues that H.A. had a "motive to lie" because she did not want to do her instructed chores. He argues that H.A.'s narrative is contrary to human experience and that her testimony is inherently incredible. He asserts that his testimony leaves the case in equipoise. Thus, he concludes, the jury and the trial court erred by finding the evidence sufficient to convict him.

## A. Witness Credibility

"The sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder." *Blankenship v. Commonwealth*, 71 Va. App. 608, 619 (2020) (quoting *Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017)). Moreover, "[t]he conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000) (quoting *Fisher v. Commonwealth*, 228 Va. 296, 299 (1984)). "In all other cases, we must defer to the conclusions of 'the fact finder[,] who has the opportunity of seeing and hearing the witnesses.'" *Id.* (quoting *Schneider v. Commonwealth*, 230 Va. 379, 382 (1985)).

"A legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness' testimony or statements." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). "Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Id.* "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006) (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)).

- 10 -

During her testimony, H.A. admitted that she recalled the facts slightly differently each time she reiterated them to law enforcement, the psychiatrist, or Child Protective Services. On brief, Lumpkin points out that her testimony was inconsistent on a number of details, including: (1) "whether semen got on her"; (2) "whether [Lumpkin] put his mouth on or in her genitalia"; and (3) "whether there was kissing."

At trial, H.A. testified that she remembered the forensic nurse Donna Cling asking her about white stuff, and whether or not white stuff got on her body. H.A. testified that she told Cling white stuff had "never been on [her] body," but that she did see the white stuff. H.A. also remembered talking to Jessica Hayes of the PATHS organization on July 23, 2019, and telling her that when Lumpkin made her "suck his thing," the white stuff came out and he wiped her with a towel.

H.A. remembered on cross-examination that Cling asked her if Lumpkin ever put his mouth on her anywhere, but she did not remember answering that question. When asked, "You didn't say down here pointing to your private area?," she said no. On redirect examination she said that even though she did not remember this at the time, she now (at the time of trial) remembered that Lumpkin did put his mouth on her vagina, "probably . . . one to two times." Further, H.A. had no audible response when asked by the Commonwealth's attorney whether she had always used the word "on" or "in" when referring to Lumpkin putting his mouth on her.

Finally, when asked if Lumpkin had ever kissed her,[2] H.A. stated that he had, but that she did not remember the number of times. She did, however, specify that Lumpkin kissed her more than just one time. When it was pointed out that she initially said that he only kissed her once in a prior interview, H.A. stated, "I don't remember that." Further, in an interview conducted by

_____

[2] H.A. later clarified that kissing meant "on the lips," as opposed to when Lumpkin put his mouth on other parts of her body.

Carlos Cottie and April Duckworth, Cottie asked H.A. if Lumpkin had ever kissed her, and she stated that he had never "kissed her on the face." These inconsistencies in H.A.'s testimony were put before the jury for its consideration. *See Kelley*, 69 Va. App. at 626 ("[A]s Virginia law dictates, '[p]otential inconsistencies in testimony are resolved by the fact finder,' not the appellate court." (second alteration in original) (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011))). In exercising its role as the factfinder, the jury weighed the evidence and resolved any inconsistencies in favor of the Commonwealth in this case.

The jury was aware of H.A.'s inconsistences in reporting. The jury considered H.A.'s testimony at trial, heard testimony from those she reported to, and reviewed a recorded interview conducted by Danville Police Corporal Amos. Whether H.A.'s inconsistences were detrimental to her credibility was a determination for the jury. By finding Lumpkin guilty, the jury concluded that H.A. was credible. Accordingly, we find that the record supports the jury's credibility determination.

### B. Reasonable Hypothesis of Innocence

"The 'reasonable hypothesis of innocence' concept is also well defined. The Commonwealth need exclude only reasonable hypotheses of innocence that 'flow from the evidence itself, and not from the imagination' of the defendant." *Kelley*, 69 Va. App. at 629 (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Merely because [a] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide." *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)).

"By finding [a] defendant guilty, therefore, the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" *Id.* (quoting

- 12 -

*Haskins*, 44 Va. App. at 9). "While a factfinder may not arbitrarily disregard a reasonable doubt, whether 'the hypothesis of innocence is reasonable is itself a "question of fact," subject to deferential appellate review.'" *Burton v. Commonwealth*, 58 Va. App. 274, 285-86 (2011) (quoting *Clanton*, 53 Va. App. at 572).

Because the jury found Lumpkin guilty, it is assumed the jury "found by a process of elimination that the evidence does not contain a reasonable theory of innocence." *Edwards*, 68 Va. App. at 301 (quoting *Haskins*, 44 Va. App. at 9). Considering the totality of the evidence, the jury did not err in rejecting Lumpkin's hypothesis of innocence—that when he moved H.A.'s clothes from the toilet to urinate and then returned them to the toilet after urinating, his semen and DNA were transferred to her underwear. The Commonwealth's evidence was competent, was not inherently incredible, and was sufficient to prove beyond a reasonable doubt that Lumpkin engaged in the sexual activity with H.A.

### III. Disproportionate Sentence

Lumpkin asserts that his sentence is unconstitutionally disproportionate. He further asserts that current Virginia case law is inconsistent with the United States Supreme Court's requirement that all sentences be proportionate to the crime committed. He argues that this Court should extend the *Miller v. Alabama*, 567 U.S. 460 (2012), analysis for juveniles sentenced to life incarceration without parole to include adults.

To the extent that Lumpkin argues that his sentence is disproportionate, this Court declines to engage in a proportionality review in cases that do not involve life sentences without the possibility of parole. *Cole v. Commonwealth*, 58 Va. App. 642, 653-54 (2011). We noted in *Cole* that the Supreme Court of the United States "has never found a non-life 'sentence for a term of years within the limits authorized by statute to be, by itself, a cruel and unusual punishment' in violation of the Eighth Amendment." *Id.* at 653 (quoting *Hutto v. Davis*, 454

U.S. 370, 372 (1982) (per curiam)).  *Cf. Vasquez*, 291 Va. at 243 (rejecting Eighth Amendment challenge to 133-year active sentence because the sentence was imposed for "eighteen separate crimes").

Here, Lumpkin was sentenced within the statutory ranges for each of his six convictions. *See* Code §§ 18.2-67.1, 18.2-67.2, and 18.2-67.3.  Although Lumpkin received four life sentences, the trial court suspended all but twenty-five years on each life sentence.  Further, for each count of aggravated sexual battery with a child under the age of thirteen, the court sentenced Lumpkin to twenty years, with ten years suspended.  These sentences are to run consecutively.  "The only reason that the aggregate sentences exceeded [Lumpkin's] life expectanc[y] [is] because [he] committed so many separate crimes."  *Vasquez*, 291 Va. at 243. Because Lumpkin was sentenced within the statutory ranges, our task is complete.  Accordingly, we find no abuse of discretion with the trial court's sentencing decision.

IV.  Video Conference Sentencing

Lumpkin asserts that his confrontation rights under the Sixth Amendment were violated when he was required to appear via video conference at his sentencing hearing.

Constitutional arguments present questions of law that we review de novo.  *Warnick v. Commonwealth*, 72 Va. App. 251, 263 (2020).  "The United States Supreme Court has stated 'the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination.'"  *Harper v. Commonwealth*, 54 Va. App. 21, 24 (2009) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1987)).  This Court's "decision in *Moses* [*v. Commonwealth*], 27 Va. App. 293 [(1998)], concluded that the Confrontation Clause of the Sixth Amendment [of the United States Constitution] does not apply to sentencing."  *Id.*  As a result, "application of the Confrontation Clause to the post-trial sentencing proceedings is inappropriate."  *Id.*

- 14 -

Thus, we decline Lumpkin's invitation to abandon existing precedent. Under the inter-panel accord doctrine, "a decision from a panel of this Court 'cannot be overruled except by the Court of Appeals sitting *en banc* or by the Virginia Supreme Court.'" *Sandoval v. Commonwealth*, 64 Va. App. 398, 419 (2015) (quoting *Clinchfield Coal Co. v. Reed*, 40 Va. App. 69, 73 (2003)). Similarly, we do not have the authority to overrule decisions of the Supreme Court of Virginia. *Vay v. Commonwealth*, 67 Va. App. 236, 258 n.6 (2017).

CONCLUSION

We find that the trial court did not abuse its discretion in refusing to appoint an expert, order medical testing, nor in sentencing Lumpkin. Further, the evidence was sufficient to convict Lumpkin. Finally, Lumpkin's Sixth Amendment right to confrontation was not violated. Accordingly, we affirm the jury's verdicts and the trial court's judgment.

*Affirmed.*